Our next case is Applications In Internet Time v. Salesforce, 2024-11-33. Mr. DeVincenzo, good morning. Good morning, Your Honor. May it please the court. The district court's findings of non-infringement and invalidity on summary judgment were wrong. With respect to both of those findings, the district court simply decided the factual issues in dispute and failed to give appellant all reasonable inferences. I'm going to begin with claim construction. We start with the language of the claims. That's where we're always supposed to start. The district court's opinion does not address the language of the claims. The claim being construed, the language being construed says, automatically detecting changes that affect an application. It is not limited to a particular structure on its face. There are also dependent claims. The dependent claims that depend from that add one single limitation, wherein the automatic detection occurs using a special program, an intelligent agent. That exists in the dependent claims. So the claims on their face suggest that they're not limited to intelligent agents, both under the ordinary meaning and based on claim differentiation. Now we turn to the specification. Appellees argue that every aspect of the invention in the patent limits all the claims to intelligent agents. That's not remotely the case. The abstract is a paragraph long. It talks about finding changes. It doesn't mention intelligent agents. The summary of the invention doesn't mention intelligent agents. And this court has found a limitation that's seeking to be read into the claim. And that's what they're doing because they're not construing the ordinary meaning. You're just reading it in. It's hard to say the invention as a whole requires that limitation when it's not even mentioned in the summary of the invention. There's one sentence, I think, where I don't remember which column it's in. But both the district court, if I remember correctly, and your adversary rely on it. It says the invention, something like that, with respect to the intelligent agents. That's probably the strongest evidence. But what is your response to it? That is in column 10. And it begins at column 10, line 26 is where the language begins. And it says, the following example illustrates how a change made to a regulation is identified on the internet and incorporated and managed by the invention. Now, that's using the word invention. But this court, when it looks at the specification, uses the invention. It's not all invention. All embodiments require the inventions required to contain this. It literally says, the following example illustrates. So that's part of the sentence. The sentence I was thinking of is in column 10, starting line 40. Yeah. That's, yeah. And then it says, a example. Then there's a paragraph setting up the illustrative example. And then the next sentence says, the invention begins tracking changes using one or more intelligent agents. But is there anything in this specification using other than intelligent agents? No. Intelligent agents are the best mode of the invention. But both the summary of the invention and the abstract describe collecting changes without using the term. So that's a particular feature, as you would expect in the dependent claims. But they're trying to read it into all the claims. Can I ask you something else, which is, you know, this word intelligent agent is defined in columns 10 and columns 20. And for example, column 20 says, it's a specialized program that makes decisions and performs tasks based on predefined rules and objectives. So I'm wondering, that's really broad. And I'm wondering, why does this matter? It matters because the judge granted summary judgment of infringement. I know. Against us on the merits. I didn't think it mattered at the claim construction hearing. We didn't think it mattered until we got the summary judgment order. If we look at the evidence, on the evidence itself, they conceded below it's a specialized program. They put forth no contrary evidence that it has rules, objectives, tasks, constraints. There's just no other evidence. And our expert went through and summarized the tasks and objectives and concluded it meets all these definitions. Now, it does have a meaning in the art, though. And the meaning is consistent with those. And the language actually distinguishes it. Because, OK, we're talking about something with tasks and objectives with respect to automatically detecting changes. And that's what makes it very different from POP. And that's why Salesforce's expert didn't apply the ordinary meaning of the phrase in doing invalidity. He didn't apply the ordinary meaning of the phrase intelligent agent. He didn't apply the district court's meaning, right? Didn't apply the district court meaning or any other. Did the district court apply its own construction in anticipation? No. The district court granted summary judgment based on a police expert's recitation of his understanding of how we were interpreting the claims for infringement. And there's no evidence supporting that. And if you look at page 25 footnote 4 of the district court's opinion, the district court recognized itself that what a police expert called AIT's interpretation is more properly characterized as an anticipation interpretation. Because they put forth no evidence that we ever took that interpretation or were taking that interpretation. A Pelley's own expert for anticipation said, well, I'm going to interpret it as any program that detects any changes. We never interpreted it that way. We're pointing to changes in metadata that admittedly and not disputed for purposes of this appeal, those are changes that affect an application. Now for anticipation, they say, well, I'm talking about, I know I'm jumping back and forth and I apologize. But for POP, what they say is POP has an input field and someone typed something in and it's stored. So their expert didn't come and say, I think that's a change that affects an application. He said, under an anticipation interpretation, I would consider that a change that affects an application. And I asked him at deposition, well, how would you apply the claim language? Do you think it discloses automatically detecting changes that affect an application? And he said, I didn't consider it. Instead, I combined it for purposes of obviousness. Setting aside that question of intelligent agents for a minute, do you think the words changes that affect and first layer, I think it's first layer, have to be interpreted? Because there seems to be maybe two different interpretations that are being advocated by the experts. And I wonder whether that's something the district court is supposed to resolve. Well, on the changes that affect, the experts actually agreed on the ordinary meaning. Salesforce's own expert testified the ordinary meaning of changes that affect indicates that the source of the change is one step removed from the claim system, not incorporated within it. So you're not just typing a change into an input field and storing it. That's not automatically detecting a change that affects an application. That's typing in someone's name. So I don't think there's a dispute on claim construction. OK. Is it changes that affect an application interpretation? Or just interpretation of changes that affect? The district court didn't use claim construction at the basis of its decision. All the district court said. So it's just ordinary meaning? Yeah, I would apply ordinary meaning. There's a question of fact and dispute. And they never asked for it to be construed below. And with respect to the third layer limitation, or the first layer, which is information about unique aspects of an application. For invalidity, the district court granted summary judgment as a matter of law. The district court relied on a single paragraph of a Pelley's expert report. That paragraph never articulates how the model of a car, the word Chevy, that's data stored. It says Chevy. How that would be considered, or why that would be considered information that is about describing, defining an aspect of an application. On its face, it's not. And the district court adopted that testimony as true. Said on summary judgment of invalidity, a reasonable juror couldn't find otherwise, despite reasoned expert opinion from Mr. Zakovich, appellant's expert. Appellant's expert said that's not true. If I take the word, a number in an Excel spreadsheet, does that number, is that unique information that is about an aspect of an application? Could a reasonable juror find it's not? And that was the question. And the district court simply adopted the opinions of a Pelley's expert and reached a conclusion. And that's very clear on unique aspects. And it's also very clear on changes that affect it. District court simply adopted the opinions of that Pelley's expert. And on changes that affect it was particularly inappropriate because the opinions he adopted weren't offered how a Pelley's own expert would interpret the claim language. He said, I wouldn't consider this to be a change that affects the application. But under an anticipation construction, which he made up, there's no evidence that Appellant has ever taken the position that the claim should be that broad. And he said, well, if I were to interpret it that way, then there would be anticipation. Is this the part of the report where he had adopted or copied the report of another expert? Yes. The entire section of POP was copied from another expert, which they submitted during the IPR. They never even talked to each other before. He couldn't remember when it was prepared, how it was prepared. So his opinions weren't only conclusory. They weren't his opinion that he believes it should be interpreted that way because he said, I'm implying AIT's interpretation. So this is a credibility issue? And there's also a credibility issue. And then most importantly, I asked this court on anticipation, or the most egregiously, I hate using that word, but claim 25 requires a metadata database. The district court granted summary judgment. Neither Apolli nor the district court even identified what the alleged metadata database is in POP. There is no metadata database in POP. They didn't identify one, and their expert didn't even address that claim. Counsel, you're into your rebuttal time. You can use it or save it. I'll save it. Thank you very much. All right. Mr. Johnson. May it please the court, your honors. The district court was correct in construing the asserted claims to require the use of intelligent agents and also was correct in granting summary judgment of invalidity and non-infringement. And I want to go to the claim construction issue with respect to intelligent agents. And, your honors, the court correctly construed automatically detecting changes that affect a particular application to require intelligent agents because the use of intelligent agents is described throughout the specification and in criticizing the very prior art that existed in the specification. The patentees repeatedly criticized the prior art as not having intelligent agents. Where is that? Column 7, starting at line 46, 47. After seven, six columns worth of descriptions of all the different types of regulations that are out there that are changing all the time, it says, quote, various attempts have been made to manage regulatory compliance, but no solution has been developed before that provides a comprehensive integrated framework for, one, absorbing business changes into the application and database without affecting the integrity of the system, two, automatically making application and database changes using intelligent agent routines, and then it goes on and down again at lines 15. It has three also, which is a pretty long thing that it says isn't in the prior art. When a patent specification says there's three objectives of the invention or distinguishes prior art on three bases, aren't patent owners entitled to choose which of those they want to recite in their claims? They don't have to choose all of them, right? No, but this, I think, is conjunctive, the three that are listed there, and I think even when you read the very next sentence in line 61, these partial solutions also do not provide a, quote, closed-loop approach to identifying changes using intelligent network agents, recommending the modifications to the business content and automatically affecting changes, affecting modifications in the system without the use of programmers and our programming. The use, and that's only in describing the prior art. When we look further in the specification, and Your Honor talked about it in column 10, the specification specifically defines the invention to include intelligent agents. Because the fact that it says example, and it says the following example illustrates, and it has example A, and then it says the language about the invention begins tracking using intelligent agents is under the heading example. That's the only example. There is no other example described in the specification that describes using something other than intelligent agents. Does our case law say that when only a single embodiment is disclosed, we're supposed to read it into the claims? Well, I think the case law dictates that when there is criticism of the prior art for not having intelligent agents, when there is lots of references to the invention, the system, and I'm prepared to go through other examples, where the only thing that's described in connection with the invention is intelligent agents, and then on top of that, when you have, again, the only embodiment being the description of intelligent agents, I think, yes, that's exactly when intelligent agents then should be read into the claim language. Can you tell me what the word intelligent agent is defined in column 20 at the top? Very broadly. I just think it could be probably any software. Am I misunderstanding that? Well, I think it's defined in a couple of different places, at column 20 and also column 10, and it's pretty similar. And it is broad, but it's the part about effecting change. And if we look at column 10, an intelligent agent is a specialized program that resides on a network or at a server as an applet and can make decisions and perform tasks based on predefined rules. Isn't there a genuine issue as to whether the deploy function is an intelligent agent? No, Your Honor, there is not. There is a complete and utter failure of description on AIT's part of the deploy function being an intelligent agent. There was one paragraph in the expert report that described the deploy function. Not once in that expert report does the expert describe it as an intelligent agent. There is no analysis of the source code pointing to where in the source code decisions are being made and tasks are being performed based on predetermined or predefined rules. The court evaluated the evidence, and again, when we look at the deposition testimony of the expert, the expert's deposition testimony is largely, it's conclusory. I mean, he never says in his report or his deposition, here are the specific reasons why it is an intelligent agent. And I can go into more detail about that, but at the end of the day, what we have here is a specification that tells a person of ordinary skill over and over again that what's important about this invention is intelligent agents. I heard a reference to claim differentiation by counsel for AIT. We all know that's a presumption, and in this case, the presumption is overcome. There's plenty of this court's case law in the Tippman case and retractable. Do you think the prosecution history deserves any weight? You know, there's prosecution history that shows that the applicant was not interpreting their own claims as requiring intelligent agents. They only made that distinctive point with respect to the dependent claims. Does that add on to the claim differentiation argument? No, Your Honor, because under the Biogen case from this court, the prosecution history cannot be used to enlarge the scope of the claims, which we know from that case. And on top of that, because they were making one argument with respect to dependent claims, I mean, it almost confirms to a person of ordinary skill in the art that that same argument would apply to the independent claims. Not necessarily. Dependent claims usually add things to independent claims. Well, but not in this case. And again, it's a presumption here, and I think this court's case law specifically with respect to the Tippman cases, retractable, we cited those at length in our briefs. Again, I think the presumption is overcome. It's a myth that the presumption is overcome here. And again, with respect to the deploy function, what was apparent from the deposition testimony was in the best quotes that they have in their briefs, again, are conclusory quotes. There's never any claim limitation by claim limitation, which is what I would expect to see, describing exactly where the functionality is, but quotes to the specific source code on what the deploy function is actually doing and why it's an intelligent agent. With respect to validity, you know, this is one of those cases where, again, they took a very narrow, they took a very broad view on the claim construction, and they walked right into the POP reference. And, you know, the POP reference anticipates each and every asserted claim. What do we do about the fact that it looks like the district court applied a different construction for anticipation than it did for infringement? I don't think it applied a different construction for infringement versus anticipation. And as we described, you know, what I think we have here is a situation where AIT, it was interesting to me, but AIT proposed a broad construction of intelligent agents that under their broad construction, I think, renders POP as anticipatory. And, again, as we submitted in connection with our briefing, if intelligent agents is required and the specific, our definition of intelligent agents, which is a narrow construction of intelligent agents is required, then we believe the claims are invalid as obvious between POP and Amati. And there's no, there's really no argument on the other side about why Amati doesn't disclose an intelligent agent. Their expert never contended that they, that Amati didn't disclose an intelligent agent. In fact, their expert never even contended that POP didn't disclose an intelligent agent. So we have here, and this is exactly what the PTAB reached in terms of its decision. I know this court reversed on procedural grounds, but the merits still remain. The question is whether it's a genuine issue of material fact, right? I mean, it's different. The PTAB is entitled to make fact findings, right? It is. You're right that it is, that it is a, you know, the question is whether it's a genuine issue of material fact. And what we have here is not one or two or three different bases in order to sustain and affirm the court's ruling in the lower court, but what we have here is, you know, a finding of non-infringement and several bases in which to invalidate the patent, not just because of POP as being anticipatory, but also that it's obvious. And unless your honors have any other questions with respect to any of the issues I've addressed, I'll cede the rest of my time. Thank you, counsel. Mr. DeVincenzo has a couple of minutes for rebuttal, two and a half minutes. Thank you. We heard counsel say that the patent repeatedly distinguishes the prior art based on the lack of intelligent agents. There's one paragraph in the specification. It doesn't use the word invention. It doesn't say all embodiments solve these problems. But more importantly, as explained in the red brief on five through, I mean, our reply brief on five through six, each of the problems identified refers to metadata tables, making application and database changes, and intelligent agents. Those are the three of the issues. They're all addressed in dependent claims. So that background should be read consistently and can be read consistently with the claims. Similarly, the prosecution is read consistently with the claims and consistently with the problem, the problems identified in the background. At the end of the day, they point to the use of the invention once in an illustrated example. When you consider the evidence as a whole, we submit that's not enough to overcome the ordinary meaning of the claim and read in a limitation. Now, with respect to the evidence on the deploy function, our expert testified explicitly that it meets the descriptions in the specification, all of them. He provided a five page source code description of the deploy function. At the end of that description, he has boxes. They're in our brief. And the appellees have never addressed them or disputed that they disclose tasks and objectives. And more importantly, a reasonable juror could find his five page description of the tasks, rules, and objectives for the deploy function supports his conclusion that the deploy function is an intelligent agent, given the broad descriptions in the specification. And then lastly, with respect to obviousness. Obviousness is only in play if the claim construction with respect to intelligent agents is affirmed. And neither the district court nor appellees have ever explained why Mr. references wouldn't be combined, couldn't be accepted by a juror. He said the intelligent agent of Imani would have no useful purpose in POP, because one's going to the internet to detect documents, and the other's an input field. So why would you take an intelligent agent that does something completely different and just put it here? And he explained it rationally and reasonably, and more important, a reasonable juror could accept that, especially in the face of the evidence offered by appellee. That is all. Thank you. Thank you, counsel. We will try to be intelligent agents in deciding this case. Case is submitted.